Filed 5/17/23  P. v. Shinn CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDWARD ALCARAZ SHINN et al.,<br><br>        Defendants and Appellants. | B316256<br><br>(Los Angeles County Super. Ct. No. NA102184)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>CHANGE IN THE JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on April 27, 2023, be
modified as follows:

1. On page 2, in the last paragraph, omit the last sentence that begins with "We affirm their convictions" and insert the following in its place:

   We affirm their convictions for murder and general conspiracy, but vacate their convictions for gang conspiracy as well as some of the sentencing enhancements and one of the special circumstances; we thus remand for resentencing.

2. On page 10, in the last paragraph, omit the first sentence that begins with "Shinn, Moreno and Landeros challenge" and insert the following in its place:

   In 344 pages of briefing (which does not include 192 pages of the People's responsive brief), Shinn, Moreno and Landeros challenge their convictions and sentences on a plethora of grounds.

3. On page 21, in the penultimate line, immediately following the phrase "and (2) the gang enhancements," insert the phrase "the gang conspiracy conviction, and" so that the full sentence reads as follows:

   Based on these changes, defendants argue that (1) AB 333 invalidates all of their convictions because the charged gang enhancements were tried at the same time as their guilt (rather than being bifurcated); and (2) the gang enhancements, the gang conspiracy conviction, and the special circumstance

finding based on gang involvement and the firearm enhancements for Shinn and Moreno that also turn on their gang involvement, must be vacated and retried under AB 333's more stringent definitions.

4. On page 24, in the section heading that starts with "**B. Invalidation**" insert the phrase "***gang conspiracy conviction,***" immediately following the phrase "***gang enhancement,***" so that the full section heading reads as follows:

> **B.** *Invalidation of gang enhancement, gang conspiracy conviction, gang-related firearm enhancement, and gang-related special circumstance*

5. On page 24, omit the last sentence of the page that continues onto page 25 and begins with "These amendments apply not only" and the parenthetical citation that immediately follows it; insert the following in its place:

> These amendments apply not only to the gang enhancement itself in section 186.22, but also to the firearms enhancement, special circumstance, and gang conspiracy crime that incorporate the definition set forth in section 186.22.  (*People v. Lee* (2022) 81 Cal.App.5th 232, 244-245 (*Lee*), review granted Oct. 19, 2022, S275449; *People v. Lopez* (2022) 82 Cal.App.5th 1, 25.)

6. On page 26, omit the sentence that begins in line 8 with "Because that proof is lacking here," and insert the following in its place:

> Because that proof is lacking here, we must vacate the gang enhancement and gang conspiracy conviction as to all three defendants, the firearm enhancements for Shinn and Moreno, and the gang-related special circumstance finding as to all three defendants.

7. On page 39, in the second sentence of the first paragraph that begins with "The gang enhancements for all three defendants," delete the first word of the sentence and replace it with "The gang conspiracy conviction for all three defendants, the" so that the full sentence reads as follows:

> The gang conspiracy conviction for all three defendants, the gang enhancements for all three defendants, the firearm enhancements for Shinn and Moreno, and the gang-related special circumstances for all three defendants are vacated; the People may elect whether to retry them.

8. On page 39, in the sentence that begins in line 6 with "The sentences are to be vacated:" add the word "general" immediately before the phrase "conspiracy counts" and add the phrase "the gang conspiracy

convictions," immediately after the phrase "if the People elect not to retry" so that the full sentence reads as follows:

> The sentences are to be vacated:  The multipliers on Shinn's and Moreno's first degree murder LWOP sentences are to be eliminated; the trial court is to impose sentences on the general conspiracy counts; if the People elect not to retry the gang conspiracy convictions, the gang-related firearm enhancements (for Shinn and Moreno) and the gang-related special circumstances (for all defendants), they are to be stricken; and the court is not to impose any parole revocation fine.

\*     \*     \*

This modification changes the judgment.

Appellants' petitions for rehearing are denied.

_____

LUI, P. J.                CHAVEZ, J.                HOFFSTADT, J.

Filed 4/27/23  P. v. Shinn CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B316256 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA102184) |
| v. | |
| EDWARD ALCARAZ SHINN et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed in part, vacated in part and remanded with directions.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant Edward Alcaraz Shinn.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Edgardo Moreno.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Alfredo Landeros.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Michael J. Wise, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

After a Mexican Mafia gang member's years-long practice of beating his mistress resulted in a beating that landed her in the hospital, the mistress—who was also the mother of one of his children—started to cooperate with law enforcement to prosecute him. Before she could testify at his trial on charges of domestic violence and attempting to dissuade a witness, he directed other gang members to execute her. The gang member and two other gang members appeal their convictions for first degree murder and other charges. We affirm their convictions, but vacate some of the sentencing enhancements and one of the special circumstances and also remand for resentencing.

# FACTS AND PROCEDURAL BACKGROUND

## I. Facts

### A. *Defendant Edward Shinn (Shinn) and Shanta Lucero (Lucero) have an affair in which Shinn regularly beats Lucero*

In 2006, Shinn was married to Elysa Garcia (wife). That same year, he started an extra-marital affair with Lucero.

Shinn's affair with Lucero was marked by domestic violence. In the more than two years between the time they met and her murder, Shinn beat her or burned her with cigarettes more than 100 times. When, in 2006, Lucero told Shinn that she was pregnant with his child, he urged her to abort the pregnancy because Shinn's wife was pregnant at the same time. Shinn continued to beat Lucero, even while she was pregnant. Lucero left California at Shinn's insistence.

In May 2007, Lucero returned to California; gave birth to her child; got back together with Shinn; and he resumed beating her regularly.

In July 2007, Shinn was arrested on charges of beating Lucero. To avoid having to testify against him, Lucero moved to Lompoc, California, again at Shinn's insistence. Due to her absence, the new criminal charges were dismissed and the case was prosecuted solely as a parole violation; this resulted in a shorter sentence, and Shinn was released from custody just a few months later, in February 2008.

Upon Shinn's release, Lucero moved back to town and moved in with Shinn. The beatings resumed.

On June 24, 2008, Shinn chased Lucero outside their home while she was carrying their child and proceeded to punch her more than 10 times, including in the face. Shinn coaxed Lucero

3

back into the residence, where he beat her further. Lucero's injuries were severe: She had a broken nose, burst blood vessels in her eyes, and a swollen jaw. She was taken to a hospital for treatment.

While at the hospital, she told law enforcement that Shinn had inflicted these injuries.

**B.** *Shinn is prosecuted for the June 2008 beating*

When Shinn learned that Lucero had spoken with police, he took their son away, beat her, and forced her to call the investigating police officer to say that her June 2008 beating was caused—not by Shinn—but instead by a group of women. Lucero subsequently told the police that Shinn had forced her to call with a new story.

On June 30, 2008, the People charged Shinn with domestic violence and with dissuading a witness. Shinn was arrested and held in custody pending trial.

In the days prior to the preliminary hearing on those charges, Shinn warned Lucero that he would have her killed if she testified at the hearing. Lucero testified anyway. While she testified, Shinn "smirk[ed]" and "sort of laugh[ed]" in the courtroom. Immediately after she testified, Shinn called to tell her, "I'm done with you, bitch. And fuck that kid, too."

**C.** *Shinn's active role in the Mexican Mafia*

For many years up to and including 2008, Shinn was a member of the Oxnard-based Chiques gang, which was one of the many Southern California-based gangs under the umbrella of the Mexican Mafia. The Mexican Mafia oversees many street gangs in California, including the Chiques gang and the West Side Longos gang. Shinn enjoyed an elevated stature within the

4

Mexican Mafia because he worked directly with some of its leaders.

By mid-2008, Edgardo Moreno (Moreno), Albaro Miranda (Miranda), and Alfredo Landeros (Landeros) were all members of the West Side Longos gang. Moreno was a "shot caller" (or "key holder") of the gang—that is, a member who directed the gang's members regarding which crimes to commit. Miranda was the gang's armorer; he was a repository of the gang's firearms and would loan or sell them to the gang's members as directed. Landeros was a younger gang member anxious to "earn his stripes" by committing crimes for the gang.

A key policy of the Mexican Mafia—and hence of the street gangs under its control—is that cooperating with law enforcement against gang members is punishable by death.

**D. *Shinn tries to persuade Lucero not to testify, while simultaneously hinting he might have her killed***

Because Shinn had two prior "strike" convictions within the meaning of our "Three Strikes" law, he believed that he was "fighting . . . 175 to life" in the pending domestic violence case involving Lucero.

Shinn took a two-track approach to his "fight."

On one track, Shinn repeatedly called Lucero from jail to encourage her to change her testimony. Specifically, he told Lucero that she needed to be "school[ed]" on how to change her testimony so as to blame her injuries on someone else. Shinn reassured her that he did not want anything to happen to her, and even said that he had divorced his wife so that he and Lucero could be together. Shinn was lying: The day after Shinn told Lucero about his divorce, he called his wife to ask her to forge paperwork making it look like they were getting a divorce. Shinn

5

later bragged to others that he was trying to "brainwash" Lucero into testifying in a way that exonerated him.

On the other track, Shinn strongly hinted to Lucero that she would be killed if she rejected his "schooling." He "threatened her a lot of times": He told her that she might have trouble if she was informing on anyone, bragged that he had the names and booking numbers of over 2,000 "homies," and told her that "it's going to be all bad" for Lucero if his "people . . . get in touch with Moreno."

### E.   *Shinn arranges to have Lucero killed*

On August 10, 2008, Shinn called his wife from jail to ask her to copy and transmit some "paperwork" to various "shot callers" in the West Side Longos, East Side Longos, and Wilmas street gangs. Around that time, Moreno approached a "shot caller" in the West Side Longos named Lewis Guerrero (Guerrero) with "paperwork" showing that Lucero had made statements to police against "her baby daddy" (that is, Shinn) as well as against another gang member out of Compton. Moreno told Guerrero that Lucero "had to go." Guerrero declined to take action against Lucero, telling Moreno that it was a "domestic" matter rather than a matter affecting the neighborhood.

On August 22, 2008, Lucero told Shinn that she was not inclined to change her testimony because, in her view, Shinn needed to "take responsibility" for his conduct in beating her.

On September 13, 2008, Moreno called Miranda and told him that two people would be coming by Miranda's residence and needed to borrow one of his firearms. Moreno was miles away in La Mirada at the time. Around 5 p.m., Moreno called Landeros. Around 6 p.m., Landeros showed up at Miranda's residence with

6

another gang member named Little Blanco. Miranda gave Landeros a loaded revolver.

Around an hour later, Landeros called Lucero from a location near her residence, and did so while blocking his phone number. Landeros and Lucero traveled together to a nearby alley. Landeros had Lucero get out of his car and get down on her knees at the alley's mouth. Landeros then shot her three times in the back, killing her. Cell phone records confirmed everyone's movements.

The following day, Landeros and Little Blanco returned the empty revolver to Miranda. The two men pantomimed someone getting on their knees in prayer and "bragg[ed]" about how they had executed her. Because the revolver had been used to "smoke some girl," Miranda disposed of it.

A few days after Lucero's death, Moreno told others that Lucero was a "rat" who got "smoked," and that Moreno had had "his torpedoes take care of it."

### F.    *Post-arrest statements*

After his arrest, Landeros told police that he did not know Lucero. Landeros had no explanation for the calls between his phone and Lucero's on the night of Lucero's killing or how their phones were traveling in tandem in the minutes before her death.

After his arrest, Miranda told a cell mate in a jail cell that was equipped with a recording device that Lucero had been killed because she had "snitch[ed]" on the "fool" who had hit her in the face.

## II.    Procedural Background

### A.    *Charges*

In February 2021, the People charged Shinn, Moreno and Landeros (collectively, defendants) with (1) the murder of Lucero

(Pen. Code, § 187, subd. (a)),[1] (2) conspiracy to commit murder (§§ 182, subd. (a)(1), 187, subd. (a)), and (3) criminal street gang conspiracy to commit murder (§§ 182.5, 187, subd (a)).  The People alleged two special circumstances for the murder count—namely, that (1) the victim was a witness to a crime who was killed to prevent her testimony (§ 190.2, subd. (a)(10)), and (2) the defendants committed the killing while active participants in a criminal street gang (*id.*, subd. (a)(22)).  The People further alleged that defendants either personally discharged a firearm causing death (as to Landeros) (§ 12022.53, subd. (d)), or were principals in a gang-related crime when a fellow principal discharged a firearm causing death (as to Shinn and Moreno) (*id.*, subds. (d), (e)(1)).  The People alleged that all three crimes had been committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)).  As to Shinn, the People alleged that his two robbery convictions each constituted "strikes" within our Three Strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(j)); as to Moreno, the People alleged that his prior assault with a deadly weapon count constituted a "strike"; the People further alleged that these prior felonies constituted "prior serious felonies" (§ 667, subd. (a)).

## B. *Trial*

The matter proceeded to a four-week joint jury trial.

Shinn took the stand.  He admitted to beating Lucero regularly, but claimed that he was trying to *protect* her.  Lucero joined the West Side Longos after she had testified against a

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

The People also charged Miranda, but his appeal is not before us.

gang member in Compton; according to Shinn, this automatically meant she put a death warrant over her head the moment she joined the gang. Shinn testified that he was trying to *protect* Lucero and was asking Moreno for help in doing so. Although Shinn, on various jail calls, repeatedly stated his belief that Lucero was the "only witness" against him and that he would "walk" if she did not show up at his trial, Shinn testified that he had no reason to kill Lucero because Shinn knew that Lucero's preliminary hearing testimony could still be admitted at trial against him under the former testimony exception to the hearsay rule.

Moreno took the stand. Although Moreno had previously stated on jailhouse calls that Landeros had killed Lucero at Moreno's behest (and that Moreno himself was at a family vow renewal ceremony in La Mirada at the time of the killing), and although Moreno's cell phone was pinging towers in La Mirada, Moreno testified that *he* had killed Lucero and had done so solely because she had cooperated with the police in the case regarding the Compton gang member. Moreno said he did not care about Lucero's cooperation in the domestic violence case involving Shinn.

Miranda took the stand. He denied that Moreno ever asked him to supply Landeros with a gun, denied knowing Landeros at all, and denied the statements he made in jail to an undercover informant admitting to giving Landeros the gun.

The jury found defendants guilty of all charges, including for first degree murder, and found true all allegations.

Shinn waived his right to a jury, and the judge found the prior "strike" convictions true. Moreno admitted his prior "strike" conviction.

9

## C. *Sentencing*

The trial court sentenced Shinn to three terms of life without the possibility of parole (LWOP) on the first degree murder charge (comprised of one LWOP sentence, but tripled because it was a third strike), plus 25 years for the firearm enhancement, plus 10 years for the two prior serious felony convictions. The court did not orally pronounce any sentence as to the remaining conspiracy counts, but "stayed" them under section 654. The court also imposed $11,295.50 in victim restitution, a $10,000 restitution fine, and court fees and assessments totaling $210.

The trial court sentenced Moreno to two LWOP sentences (comprised of one LWOP sentence, but doubled because it was a second strike), plus 25 years for the firearm enhancement, plus five years for the prior serious felony conviction. The court did not orally pronounce any sentence as to the remaining conspiracy counts, but "stayed" them under section 654.

The trial court sentenced Landeros to LWOP, plus 25 years for the firearm enhancement. The court did not orally pronounce any sentence as to the remaining conspiracy counts, but "stayed" them under section 654.

## D. *Appeal*

Shinn, Moreno and Landeros filed timely notices of appeal.

## DISCUSSION

Shinn, Moreno and Landeros challenge their convictions and sentences on a number of grounds. We have broken these challenges into three broad categories—namely, challenges to evidentiary rulings, challenges based on Assembly Bill No. 333 (2021-2022 Reg. Sess.) (AB 333), and challenges to various aspects of their sentences.

10

## I.    Evidentiary Challenges

Shinn raises three challenges to the trial court's evidentiary rulings.  We review such rulings for an abuse of discretion.  (*People v. Mataele* (2022) 13 Cal.5th 372, 413.)

### A.    *Admission of wife's statement*

#### 1.    *Pertinent facts*

During a July 21, 2019, jailhouse telephone call, Shinn and his wife got into an argument over a "star witness" in the upcoming trial in this case.  After a heated back-and-forth exchange where the wife kept cutting Shinn off as he was urging her to contact that witness, the following exchange occurred:

| | |
|---|---|
| [Wife:] | "*If you fuckin' mak[e] this shit worse, I'm gonna tell the fuckin' people I—*" |
| [Defendant:] | "Please, listen, Mom—" |
| [Wife:] | "—*still have—*" |
| [Defendant:] | "—mira (look)." |
| [Wife:] | "—*the fuckin' letter.*" |
| [Defendant:] | "Mira (Look)." |
| [Wife:] | "*I still have the letter when you sent those guys to fuckin' kill—*" |
| [Defendant:] | "—Mamita (Little Momma)—" |
| [Wife:] | "—*that bitch.*" |
| [Defendant:] | "Mama (Mommy)." |
| [Wife:] | "So I'm gonna call the fuckin'—" |
| [Automated operator:] | "Thank you for using GTL." |

(Italics added.)

Over Shinn's hearsay objection, the trial court ruled that the jury could hear the snippet of the call containing the italicized language and decide for itself whether the wife's

11

statement—in light of Shinn's decision to hang up on her rather than refute her statement—could be treated as his tacit admission that he did, in fact, send a letter directing Lucero's murder. The court instructed the jury using CALCRIM No. 357, leaving the jury to decide for itself whether to believe that Shinn would have "naturally … denied the statement if he thought it was not true" and whether he "could have denied it but did not."

2. *Analysis*

The hearsay rule bars the admission of out-of-court statements for their truth. (Evid. Code, § 1200.) The rule does not, however, bar the admission of a party's statements when offered *against* that party—whether the party makes those statements himself (Evid. Code, § 1220) or whether the party adopts statements made by someone else (Evid. Code, § 1221). A party is deemed to adopt someone else's statement as his own— and hence have it admitted against him notwithstanding the hearsay rule—if the other person's statement ""would normally call for a response if the statement were untrue,"" yet the party instead remained silent, evasive, or equivocal. (*People v. Jennings* (2010) 50 Cal.4th 616, 661 (*Jennings*); *People v. Riel* (2000) 22 Cal.4th 1153, 1189.) A trial court properly allows a "'jury to decide'" whether to treat a party's statement as an adoptive admission as long as "'the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny the accusation.'" (*People v. Geier* (2007) 41 Cal.4th 555, 590, quoting *People v. Edelbacher* (1989) 47 Cal.3d 983, 1011.)

Here, the trial court did not abuse its discretion in concluding that the evidence sufficiently supported a reasonable inference that Shinn had adopted his wife's statement when he

12

hung up on her, such that it should go to the jury. Shinn hung up on his wife immediately after she said, "I still have the letter when you sent those guys to fuckin' kill . . . that bitch." Whether an accusation of orchestrating a murder, if untrue, would "normally call for a response" is certainly reasonable enough to go to the jury. Whether Shinn's act of hanging up rather than denying the wife's accusation constitutes an adoption of that accusation through requisite silence, evasiveness, or equivocality is also reasonable enough to go to the jury. (Accord, *In re Jordan R.* (2012) 205 Cal.App.4th 111, 136 [defendant's conduct in hanging up when accused of misconduct rendered the statements "adoptive admission[s]"].)

Shinn responds with three groups of arguments.

First, he argues there was insufficient evidence to submit the issue of whether this was an adoptive admission to the jury. He points to the transcript, urging that his wife kept interrupting him and thus prevented him from denying the truth of her statement. Although his wife certainly interrupted him several times, once she got out her full statement, Shinn did not even try to correct her; he simply hung up. Shinn posits that the trial court's ruling was based on incorrect facts because the court stated that Shinn hung up "the moment [his wife] mentioned anything [potentially about] this case" and because Shinn and his wife talked about the case during the call for several minutes before she made the italicized statement. Shinn misreads the transcript. What the transcript shows is that Shinn and his wife discussed his efforts to have her contact a "star witness" for many minutes before he hung up on her; the topic of Shinn's "kill order" did not come up until the very end of the conversation, right before he hung up on his wife. It is clear from the context of the

13

court's ruling that what it meant by "anything [potentially about] this case" was the kill order, not the prior discussions about the star witness. Shinn lastly asserts that it was unclear who hung up on whom. We disagree. The transcript reflects that the end of the call cut off the wife mid-sentence; a jury could reasonably conclude that she did not hang up on herself mid-sentence. Similarly, the prosecutor proffered—without dispute—that defendant had ample money on his phone card to avoid having the call cut short due to lack of money; and even if that proffer may not be considered, the jury could look at the context as a whole and reasonably conclude that Shinn hung up on his wife. That is all that is needed to send this question to the jury.

Second, Shinn argues that the statement should have been excluded under Evidence Code section 352. That section empowers a trial court to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Here, Shinn's adoptive admission is very probative of his intent to kill Lucero and his involvement in directing others to kill her. Shinn is correct that this statement is prejudicial to him (as all relevant evidence introduced by the People typically is), but Evidence Code section 352 is concerned with whether it is *unduly* prejudicial, and *undue* prejudice turns on whether the evidence is emotionally evocative. (E.g., *People v. Schultz* (2020) 10 Cal.5th 623, 670.) This evidence is not.

Lastly, Shinn argues that admission of this evidence violated due process. Because it complied with the Evidence Code, however, it did not violate due process. (*People v.*

14

*Hawthorne* (1992) 4 Cal.4th 43, 58; *People v. Lawley* (2002) 27 Cal.4th 102, 154-155.)

**B.** *Admission of Carlos Ponce's statement*

1. *Pertinent facts*

a. Jailhouse calls

Moreno was placed in a jail cell with Carlos Ponce (Ponce) and Raul Aguilar (Aguilar), two other West Side Longos gang members. The cell contained a hidden recording device.

i. March 26, 2010, Conversation

On March 26, 2010, the three men discussed Lucero's killing. Moreno told Ponce and Aguilar that Landeros wanted to "do it" because he wanted to "earn [his] stripes" in the gang, and that Moreno had consequently "told [Landeros] to do it alone." Ponce then noted that prosecutors could still "try to get [Moreno] for the conspiracy to commit murder" unless Moreno got Landeros "to say that he didn't do it" and unless Moreno came up with an alibi. Moreno responded that he had an alibi because he was "at a wedding" when the killing went down. Moreno later reported that Miranda had supplied the gun used to kill Lucero and had called Moreno afterwards to tell him that "[t]he . . . (job)" was "done."

ii. May 3, 2010, Conversation

Five weeks later, the three men again discussed Lucero's killing. Moreno again reminded Ponce and Aguilar of his alibi for the killing as well as the fact that Landeros was "the one that did her." Ponce again responded that prosecutors could "still get [Moreno] for conspiracy." After Ponce recounted that Shinn had passed the "paperwork" on Lucero to his wife, so that the wife could pass that paperwork on to Moreno, Ponce seemingly expressed admiration for Shinn, noting "*He had his baby's mom*

15

*killed. He killed his baby's mom. That's gangster.*" (Italics added.) Moreno did not dispute that statement; instead, Moreno explained how he would avoid responsibility for his role in Lucero's killing by denying knowing Shinn (because Shinn was "from Oxnard") and by asserting his alibi.

b.      Severance motion

Prior to trial, Shinn made two motions to sever his trial from his codefendants. Shinn also objected to the introduction of Ponce's May 3, 2010, statements italicized above.[2] The People opposed severance, and argued that Moreno had adopted Ponce's statement and Moreno's adoptive admission was against his penal interest. The trial court denied the severance motion and ruled that Ponce's statement was admissible.

2.      *Analysis*

Although Shinn urged that severance was appropriate because the admission of Ponce's statement violated the Confrontation Clause and because it was inadmissible hearsay,[3] Shinn on appeal presses only the hearsay objection as well as a new objection that admission of this evidence contravenes Evidence Code section 352.

---

[2]      Shinn's motions also opposed the introduction of statements made by other codefendants, but Shinn does not appeal the introduction of those other statements.

[3]      The Confrontation Clause objection is not well taken anyway. The jailhouse conversations were recorded surreptitiously, and it is now well settled that the Confrontation Clause after *Crawford v. Washington* (2004) 541 U.S. 36 only applies if an out-of-court statement is "testimonial" and that statements between friends who do not realize they are being recorded are not "testimonial" statements. (*People v. Washington* (2017) 15 Cal.App.5th 19, 28-29 [so holding].)

16

a. Admissibility of Ponce's May 3, 2010, statement under the hearsay rule

Hearsay is generally inadmissible. (Evid. Code, § 1200, subd. (b).) Two exceptions to this general rule of inadmissibility are pertinent to—and together justify—the admission of Ponce's statement during the May 3, 2010, conversation.

The first pertinent exception is the adoptive admission exception. As noted above, a party is deemed to adopt someone else's statement as his own if the other person's statement "would normally call for a response if the statement were untrue" and if the party—rather than dispute the statement—instead remains silent, evasive, or equivocal. (Evid. Code, § 1221; *Jennings, supra*, 50 Cal.4th at p. 661.) Here, Ponce asserted that Shinn had committed the crime of murder by "ha[ving] his baby's mom killed," yet Moreno—rather than denying the truth of this statement—merely reaffirmed that he would deny knowing Shinn and would assert an alibi. Contrary to what Shinn argues on appeal, Ponce knew Moreno was potentially liable for Lucero's murder (1) because Moreno had previously told Ponce—during their March 26, 2010, conversation—that he had ordered Landeros to do the killing, (2) because Shinn had transmitted the paperwork on Lucero to Moreno, and (3) because Moreno had gotten confirmation of the killing from Miranda. Indeed, Ponce had repeatedly remarked that Moreno could still be liable for Lucero's murder as a coconspirator. Because Moreno had admitted to Ponce that Moreno had orchestrated Lucero's murder after Shinn gave him the "paperwork" on her, Ponce's statement that Shinn "had his baby's mom killed" implicated Moreno in the murder. Because a person liable for a murder (whether on a theory of direct liability or a theory of conspiratorial liability)

17

would normally dispute his involvement, Moreno adopted Ponce's statement when he failed to dispute Ponce's reaffirmation of Shinn's role in making the kill order that Moreno subsequently carried out. As a result, Ponce's statement became *Moreno's* statement.

The second pertinent hearsay exception is the exception for declarations against interest. Evidence Code section 1230 provides that a hearsay statement is admissible if (1) the declarant is unavailable, (2) the declaration was against the declarant's penal interest when made, and (3) the declaration is sufficiently reliable. (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) In applying this hearsay exception, the appropriate question is whether each statement to be admitted is "specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441.) Because Moreno adopted Ponce's statement, the declarant is Moreno. Moreno was unavailable to testify at the joint trial due to his privilege against self-incrimination. The statement that Shinn had directed Lucero's murder—stated immediately after Moreno had admitted his role in carrying out that murder as well as Ponce's (accurate) assessment that Moreno could be held liable for the murder as a conspirator—was against Moreno's penal interest when Moreno adopted it. And because it was, as far as Moreno and Ponce knew, a statement between fellow gang members who had no incentive to exaggerate or to minimize their roles, it was sufficiently reliable. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 (*Greenberger*) ["the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"].) Under California law, if a statement constitutes a declaration against penal

18

interest as to one party and "implicates" another party at the same time, that statement is admissible in a joint trial against *both* of those parties notwithstanding the hearsay rule as long as it meets the "constitutional requirement of trustworthiness." (*Id.* at pp. 332-335; *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176-177.) Here, the trial court did not abuse its discretion in finding that Moreno's adoptive admission implicated both himself and Shinn in Lucero's murder and, as noted above, was reliable and hence trustworthy.

Because Ponce's statement was properly admitted into evidence and was admissible against both Moreno and Shinn, the trial court properly admitted that statement and did not abuse its discretion in denying Shinn's severance motion because the cross-admissibility of that evidence counseled strongly in favor of a joint trial. (*People v. Holmes, McClaine & Newborn* (2002) 12 Cal.5th 719, 801-802 [noting that "joint trials are preferred" and that severance "may be appropriate" only "'if there is an incriminating confession'" admissible against one—but not all—defendants to be jointly tried]; *People v. Sanchez* (2016) 63 Cal.4th 411, 463-464 [same].)

> b. Admissibility of Ponce's May 3, 2010, statement under Evidence Code section 352

The trial court also did not abuse its discretion in admitting Ponce's statement—as adopted by Moreno—under Evidence Code section 352. The statement was probative of Shinn's role in getting the ball rolling on Lucero's murder. It was also not unduly prejudicial.

> c. Lack of prejudice

The erroneous admission of evidence and the failure to sever defendants can be harmless if there is no reasonable

19

probability that the defendant would have obtained a better result if the matter had been severed. (*People v. McLain* (1988) 46 Cal.3d 97, 105-106; *People v. Wheeler* (1973) 32 Cal.App.3d 455, 461; *People v. Partida* (2005) 37 Cal.4th 428, 439.) Shinn argues that we must apply the harmless error test reserved for federal constitutional errors; we reject this argument, as the alleged error here is purely one of state evidentiary law. But even if we were to apply the more stringent harmless error test and ask whether the admission of Ponce's statement was harmless beyond a reasonable doubt, it was. That is because the evidence of Shinn's involvement in Lucero's murder was very strong. Shinn had the motive to kill her due to her upcoming testimony in his trial that would put him away for "175 to life." Shinn told Lucero she was in trouble if "his people" got hold of Moreno, and Shinn proceeded to make good on that threat by transmitting Lucero's "paperwork" to Moreno to facilitate Lucero's killing. Shinn's wife stated on the later jailhouse call that the paperwork Shinn gave her was effectively a kill order. Ponce's statement regaling Shinn for issuing that kill order does not undercut this otherwise overwhelming evidence of Shinn's involvement.

    d. Shinn's further arguments

Shinn makes three further arguments.

First, he argues that Ponce's statement is not admissible because it is not admissible against *Ponce*'s penal interest. This is irrelevant. What matters, as noted above, is that Moreno adopted Ponce's statement as his own and that Moreno's acknowledgment that Shinn had directed a murder that Moreno had—in front of Ponce—already taken responsibility for carrying out, was certainly against Moreno's penal interest.

Second, Shinn argues that *Greenberger* is not factually "on all fours" with this case. Again, this is irrelevant because *Greenberger* set forth the applicable test for admitting one defendant's declaration against interest against another defendant during their joint trial; as noted above, that test is satisfied here.

Lastly, Shinn argues that Ponce's statement would have mattered to the outcome of his trial. Again, we disagree for the reasons stated above.

## C. *Cumulative error*

Shinn argues that these two errors, even if not sufficient on their own to justify reversal of his convictions, do so when considered cumulatively. We disagree. Because we conclude that the trial court did not commit two evidentiary errors, there is no error to cumulate. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1064.)

## II. AB 333-Based Challenges

Effective January 1, 2022, AB 333 (1) alters the requirements of the street gang enhancement set forth in section 186.22, which had the ripple effect of altering the requirements of the firearm enhancement and special circumstance that borrow section 186.22's definition (*People v. Lopez* (2021) 73 Cal.App.5th 327, 346 (*Lopez*)); and (2) requires that adjudication of the gang enhancement be bifurcated to a separate stage of trial following the adjudication of guilt (Pen. Code, § 1109). (Stats. 2021, ch. 699, §§ 4, 5.) Based on these changes, defendants argue that (1) AB 333 invalidates all of their convictions because the charged gang enhancements were tried at the same time as their guilt (rather than being bifurcated); and (2) the gang enhancements, as well as the special circumstance finding based on gang involvement and

21

the firearm enhancements for Shinn and Moreno that also turn on their gang involvement, must be vacated and retried under AB 333's more stringent definitions.  Because resolution of these issues requires statutory interpretation, constitutional questions, and the application of the law to undisputed facts, our review is de novo.  (*People v. Tirado* (2022) 12 Cal.5th 688, 694 (*Tirado*) [statutory interpretation]; *County of Santa Clara v. Superior Court* (2023) 87 Cal.App.5th 347, 358 (*County of Santa Clara*) [constitutional interpretation]; *Martinez v. Brownco Construction Co.* (2013) 56 Cal.4th 1014, 1018 (*Martinez*) [application of law to undisputed facts].)

> **A.**     ***Invalidation of all convictions due to failure to bifurcate the gang enhancement (and other enhancements and special circumstances based on the gang enhancement)***

AB 333 added section 1109, which requires that the "truth" of the gang enhancement allegation contained in section 186.22 be adjudicated "in [a] separate phase[]" *after* guilt is adjudicated. (§ 1109, subd. (a).)  Currently, the appellate courts in California are divided over whether section 1109 applies retroactively to persons, like defendants, whose convictions are not yet final but who were tried prior to AB 333's effective date.  (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 564 (*Burgos*) [section 1109 is retroactive], review granted July 13, 2022, S274743; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128 [same]; *People v. Montano* (2022) 80 Cal.App.5th 82, 108 [same] with *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [section 1109 is not retroactive]; *People v. Bourkes* (2022) 83 Cal.App.5th 937, 948 [same]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [same],

22

review granted Oct. 12, 2022, S275341.) Our Supreme Court has granted review in *Burgos*, ostensibly to resolve this split.

We need not wade into this split of authority, or try to read the tea leaves about what our Supreme Court will do, because our Supreme Court has held that any error in the failure to bifurcate the gang enhancement under section 1109 is harmless if it is not reasonably likely the exclusion of evidence related solely to the gang enhancement would have changed the jury's verdicts on guilt. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208-1210 (*Tran*).) The vast majority of gang-related evidence in this case was directly relevant to the charged crimes of murder, conspiracy to commit murder, and gang conspiracy to commit murder. Thus, even if the gang enhancements, gang-related firearm enhancements and gang-related special circumstances had been bifurcated, much of the gang-related evidence would still have been admitted during the guilt phase of the trial. This includes the evidence regarding Shinn's elevated role in the Mexican Mafia, that gang's tenets against snitching, the organization of that gang as well as the West Side Longos, and the positions of Moreno, Landeros and Miranda within the West Side Longos. The only evidence that would have been excluded—because it was relevant solely to the gang enhancement—was the evidence of (1) the four crimes committed in the past by two Mexican Mafia gang members and two West Side Longos gang members— none of whom had any role in Lucero's murder—relevant to prove the pattern of gang activity; (2) the gang experts' testimony regarding the Mexican Mafia's and West Side Longos' primary activities (which included murder, attempted murder, assault with a deadly weapon, possession of illegal firearms, and witness intimidation) relevant to prove the gang's purpose; and (3) the

23

gang expert testimony regarding the symbols and sizes of the two gangs.  Yet this evidence is either less egregious than the crimes charged in this case or wholly irrelevant to whether the charged defendants committed the crimes charged in this case.  (Accord, *Tran*, at pp. 1208-1210 [finding failure to bifurcate harmless]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [same].)  The evidence of defendants' guilt of Lucero's murder is also incredibly strong, and is comprised of the wealth of recorded jailhouse calls where Shinn and Moreno admitted to their roles in the killing, of cell phone records, and of the recorded statements of others complicit in the crime.  Thus, the failure to bifurcate provides no basis for disturbing defendants' convictions.

**B.** *Invalidation of gang enhancement, gang-related firearm enhancement, and gang-related special circumstance*

AB 333 also amends the definition of the gang enhancement in several ways because it now requires: (1) the commission of two or more prior offenses within three years of the date of the current offense, and does not include the crimes charged in this case in that tally; (2) the benefit of the charged crime(s) to the gang be "more than reputational"; and (3) proof that the gang members "collectively engage in, or have engaged in, a pattern of criminal gang activity."  (§ 186.22, subds. (f), (g).)  These amendments apply retroactively to cases, like defendants', that are not yet final.  (*Tran, supra*, 13 Cal.5th at pp. 1206-1207.)  Because these amendments effectively impose new requirements of proof, jury instructions that omit them are defective.  (*Id.* at p. 1207.)  These amendments apply not only to the gang enhancement itself in section 186.22, but also to the firearms enhancement and special circumstance that incorporate the

24

definition set forth in section 186.22. (*People v. Lee* (2022) 81 Cal.App.5th 232, 244-245 (*Lee*), review granted Oct. 19, 2022, S275449.) The People assert that AB 333 cannot amend the special circumstance because doing so would unconstitutionally amend a voter-enacted initiative (namely, Proposition 21). The Courts of Appeal are also currently split on this question. (Compare *People v. Rojas* (2022) 80 Cal.App.5th 542, 547, 557 (*Rojas*) [AB 333 unconstitutionally amends Proposition 21], review granted Oct. 19, 2022, S275835 with *Lee*, *supra*, at pp. 240-245 [AB 333 does not unconstitutionally amend Proposition 21]; *People v. Lopez* (2022) 82 Cal.App.5th 1, 24-25 [same].) This question is also currently before our Supreme Court. (*Rojas*, *supra*, 80 Cal.App.5th 542; *Lee*, *supra*, 81 Cal.App.5th 232.) However, we are more persuaded by the reasoning of the cases holding that AB 333 may constitutionally be applied to the special circumstance; because the People's arguments to the contrary are ably dealt with in those cases, we will not repeat them here.

Of course, the omission of elements is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (*Tran, supra*, 13 Cal.5th at pp. 1207-1209.) In this context, *Chapman's* harmless beyond a reasonable doubt analysis requires us to ask: Is the evidence of the missing elements undisputed and overwhelming? (*People v. Merritt* (2017) 2 Cal.5th 819, 828.) We conclude the answer is "no." Here, nearly all of the prior convictions admitted in this case were committed by a single person; they were not committed "collectively." Although the Courts of Appeal are split on what the term "collectively" means (compare *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1088-1089 ["collectively" requires proof that

the prior offenses were "committed by more than one person"]; *Lopez, supra*, 73 Cal.App.5th at pp. 344-345 [same] with *People v. Clark* (2022) 81 Cal.App.5th 133, 145-146 ["collective[]" action may also be shown by "two gang members who separately committed crimes on different occasions"]), we are more persuaded by the cases holding that collectively means that each prior crime must be committed by more than one gang member. Because that proof is lacking here, we must vacate the gang enhancements as to all three defendants, the firearm enhancements for Shinn and Moreno, and the gang-related special circumstance finding as to all three defendants.

## III.   Sentencing Challenges

Defendants raise a number of challenges to their sentences. Trial court rulings involving the interpretation of statutes or the application of undisputed facts to the law are reviewed de novo. (*Tirado, supra*, 12 Cal.5th at p. 694 [statutory interpretation]; *County of Santa Clara, supra*, 87 Cal.App.5th at p. 358 [constitutional interpretation]; *Martinez, supra*, 56 Cal.4th at p. 1018 [application of law to undisputed facts].)  Factual findings are reviewed for substantial evidence.  (E.g., *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)  And sentencing decisions involving the exercise of discretion are reviewed for an abuse of that discretion.  (E.g., *People v. Panozo* (2021) 59 Cal.App.5th 825, 837.)

### A.   *Allocution*

Shinn argues that the trial court violated his statutory and due process-based rights to speak (or allocute) at his sentencing hearing.

26

### 1.    *Pertinent facts*

At his November 1, 2021, sentencing hearing, Shinn was represented by counsel.  At the outset of the hearing, the trial court confirmed that Shinn's counsel had filed a motion for new trial that needed to be resolved prior to sentencing.  Shinn's counsel noted that Shinn himself was "requesting" a continuance of the sentencing hearing because Shinn had consulted a new attorney about filing a second motion for new trial and Shinn was "working on legal filings of his own."  After confirming with Shinn that his attorney's representations were correct, the trial court denied the request for a continuance.  The court then invited argument on the previously filed new trial motion and ultimately denied the motion.

The court then asked, "Defendant waive time for judgment, arraignment for sentencing, no legal cause?"  Shinn's counsel responded, "Yes, your honor."  Shinn then asked, "Can I address the court?" but the trial court proceeded to impose sentence.  (The record does not reflect whether the court heard defendant's question.)  The court imposed sentence.  When the court asked the prosecutor for the current tally of Shinn's custody credits, Shinn twice interjected, "I want to address the judge."  The court then imposed direct restitution and informed Shinn of his right to appeal.

When the court asked Shinn's counsel if he had "anything further," counsel noted an objection to the amount of the $10,000 restitution fine and then said that Shinn "would like to address the court."  The court responded, "No."  The following colloquy occurred:

[Shinn:]          "I can't address the court?"
[The court:]      "No."

27

| | |
|---|---|
| [Shinn:] | "There's no bias?  Conflict of interest?  Huh?" |
| [The court:] | "That's what you want to address, bias?" |
| [Shinn:] | "You're biased.  Yeah, you're biased." |

Shinn then opined that the trial judge had been "prejudicial" "from the get-go," and that he was "gonna appeal."

      2.    *Analysis*

Before a trial court may impose a criminal sentence, the court must ask the defense "whether [there is] any legal cause to show why judgment should not be pronounced against him."  (§ 1200.)  "Legal cause" to prevent the pronouncement of judgment is statutorily defined to include that (1) the defendant "is insane," or (2) the defendant has "good cause to offer, either in arrest of judgment or for a new trial."[4]  (§ 1201.)  A defendant also has the right to present *evidence* in support of a mitigated sentence by testifying on his own behalf under oath and subject to cross-examination.  (§ 1204; *People v. Evans* (2008) 44 Cal.4th 590, 598 (*Evans*).)  However, a defendant does not have the right to argue mitigating factors *other than as a witness*, particularly when represented by counsel.  (*Evans*, at pp. 599-600; *Tran, supra*, 13 Cal.5th at pp. 1225-1226.)

The trial court did not transgress any of these rules.  The court asked Shinn's counsel if there was "any legal cause" not to impose sentence, and counsel responded, "No."  That is sufficient—by itself—to constitute compliance with section 1200.

---

4     A motion "in arrest of judgment" tests whether the court lacks "jurisdiction of the offense" charged, whether the facts "constitute a public offense," or whether there is a "legal bar" to prosecution.  (§§ 1185, 1004; *People v. Morgan* (1977) 75 Cal.App.3d 32, 39-40.)

(*Tran, supra*, 13 Cal.5th at p. 1225 ["Here, the trial court asked whether there was 'any legal cause as to why [the] sentence should not be imposed' [and] . . . Tran's counsel replied, 'No.' That satisfies section 1200"].) Defendant also did not at any point offer or ask to testify on his own behalf at the sentencing hearing. Thus, there was no violation of section 1204. And, as noted above, defendant has no other statutory or constitutional right to address the court at sentencing.

Defendant resists this conclusion with two arguments.

First, defendant seems to argue that he is entitled to countermand his counsel's representation to the court that there was no "legal cause" to forestall the imposition of sentence. He is wrong. A criminal defendant who is represented by an attorney is bound by his attorney's representations to the court. (*People v. Merkouris* (1956) 46 Cal.2d 540, 554-555 (*Merkouris*); *Townsend v. Superior Court* (1975) 15 Cal.3d 774, 780-781; cf. *McCoy v. Louisiana* (2018) __U.S.__ [138 S.Ct. 1500, 200 L.Ed.2d 821] [defendant not bound by counsel's tactical decisions about the theory of the defense].) The defendant will not be permitted to contradict his attorney. (*Merkouris*, *supra*, at pp. 554-555.) Indeed, California cases specifically recognize that counsel may declare "no legal cause" on behalf of the client. (E.g., *People v. Cross* (1963) 213 Cal.App.2d 678, 681-682; *People v. Wiley* (1976) 57 Cal.App.3d 149, 166.) At most, a defendant in this situation would be left to argue that his counsel's representation constituted ineffective assistance of counsel. To prevail on such a claim, however, a defendant would need to show that his counsel's performance was deficient and that, but for the deficiency, it is reasonably probable that the result of the proceeding would have been different. (*People v. Mickel* (2016) 2

29

Cal.5th 181, 198.)  Even if we assume for the sake of argument that Shinn's counsel was somehow constitutionally deficient for representing that there was no legal cause to forestall sentencing, defendant has not established that counsel's conduct was prejudicial.  Contrary to defendant's intimation that we must presume prejudice because we do not know what defendant was trying to put on the record, it is Shinn's burden to show prejudice. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218; accord, *People v. Nelson* (1967) 257 Cal.App.2d 282, 285 ["Omission of the allocution is in itself not necessarily prejudicial," particularly where the defense is represented by counsel]; *People v. Billets* (1979) 89 Cal.App.3d 302, 310-311 [even outside of the ineffective assistance of counsel context, defendant must prove that the failure to allocute was prejudicial].)  Although Shinn's counsel said that Shinn himself and perhaps a new lawyer would be making additional filings, Shinn has not established—either before the trial court or this Court—that those filings would have forestalled the imposition of sentence, particularly when those filings would constitute defendant's second and third motions for new trial.  At most, Shinn seemed to indicate that he thought the trial judge was biased, but this argument was a recurring complaint of Shinn's and, on the record here, falls woefully short of what is necessary to invalidate any of the trial court's rulings.

Second, Shinn argues that the court separately erred in not allowing him to address the court by taking the stand again as he had at trial.  But there is nothing in the record to indicate that Shinn *asked* to testify a second time; indeed, all Shinn offers on that point in his briefs is speculation.

## B.    *Doubling and Tripling of LWOP Sentences*

Shinn and Moreno argue that the trial court erred in tripling (in Shinn's case) and doubling (in Moreno's case) the LWOP sentence imposed on the first degree murder conviction. The Courts of Appeal are divided over whether an LWOP sentence may be doubled or tripled under our Three Strikes law. The majority rule is that it is inappropriate to do so.  (*People v. Smithson* (2000) 79 Cal.App.4th 480, 503-504; *People v. Mason* (2014) 232 Cal.App.4th 355, 367-368; *People v. Coyle* (2009) 178 Cal.App.4th 209, 219.)  These cases rely on the plain language of the governing statute:  That statute mandates the doubling (due to one prior "strike") or tripling (due to two prior "strikes") of (1) the "determinate term" or (2) the "minimum term for an indeterminate term."  (§ 667, subd. (e)(1).)  Because an LWOP sentence is by definition *not* a "determinate term" and does not have a "minimum term," these cases reason, the statutory mandate to double or triple a sentence simply does not apply to LWOP sentences.  The minority rule provides that doubling or tripling the sentence is permissible because the statutory language is ambiguous and the overarching purpose of the Three Strikes law is to increase sentences.  (*People v. Hardy* (1999) 73 Cal.App.4th 1429, 1433-1434 (*Hardy*).)  As between the two lines of authority, we conclude that the majority rule is better reasoned:  It is more consistent with the language of the statute; further, doubling or tripling an LWOP sentence does not in any meaningful sense increase a sentence because, as the saying goes, we only have one life to live.  The sole impediment to this conclusion is that *Hardy* is a prior decision of this Division. The People contend that this fact means that the stare decisis forever binds us.  We disagree.  Although we agree that "stare

31

decisis teaches that a court usually should follow prior judicial precedent even if the current court might have decided the issue differently," particularly when it comes to "issue[s] of statutory construction" (*Bourhis v. Lord* (2013) 56 Cal.4th 320, 327), that principle is "not absolute" and may be overcome "for good reason" (*ibid.*). Here, we find such good reason—chiefly, that *Hardy* was decided without the benefit of reasoning set forth in the later cases and that disregarding *Hardy* harmonizes the law in California and brings uniformity (and hence certainty) to the law on this issue. We accordingly reverse the trial court's sentences on the first degree murder counts with directions to impose a single LWOP sentence instead.

C. ***Application of Assembly Bill No. 518 (2021-2022 Reg. Sess.) (AB 518)***

Moreno and Landeros argue that they are entitled to a remand to allow the trial court to reconsider whether to stay their LWOP sentences instead of staying their two conspiracy convictions, which ostensibly carry a lower sentence. At the time of their initial sentencing, section 654 required trial courts—when confronted with multiple counts of conviction for the same conduct—to impose the sentence "under the provision that provide[d] for the longest potential term of imprisonment" and to stay the other counts. (Former § 654, subd. (a).) However, our Legislature subsequently enacted AB 518, which took effect on January 1, 2022, and which is retroactive to non-final convictions. (*People v. Mani* (2022) 74 Cal.App.5th 343, 379-380 (*Mani*) [AB 518 is retroactive].) AB 518 amends section 654 to give trial courts the discretion to choose which of two terms to impose and which to stay (rather than being obligated to impose

32

sentence on the count with the longer term of imprisonment).  (§ 654.)

　　We reject Moreno and Landeros's argument for two reasons.

　　First, applying the amended version of section 654 in a manner that would empower a trial court to stay an LWOP sentence in favor of a lower sentence would violate section 1385.1.  That section provides that, "[n]otwithstanding Section 1385 *or any other provision of law*, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive."  (§ 1385.1, italics added.)  Because applying AB 518 to section 654 when one of the sentences is an LWOP sentence would give a trial court the power to functionally strike and/or dismiss the special circumstance that mandates that LWOP sentence, section 1385.1's instruction that it applies "[n]otwithstanding . . . any other provision of law" means that it takes precedence over the newly amended section 654.  (Accord, *People v. Garcia* (2022) 83 Cal.App.5th 240, 257-258.)  Moreno resists this conclusion, countering that striking a special circumstance or an enhancement is not the same as staying the resulting LWOP sentence under section 654.  Whether it is *technically* the same or not, it has the same effect and would, in effect, nullify section 1385.1.  We decline to construe AB 518 to do an end run around a statute that takes precedence.

　　Second, even if we were to conclude that the newly amended section 654 applied to Moreno and Landeros, remand for the trial court to apply its newfound discretion is not warranted in this case.  That is because remand is not warranted

33

if the trial court has already "clearly indicated" at sentencing "that it would not . . . have stricken [the] enhancement"—or, in this case, stayed one sentence in favor of a shorter sentence—had it had the discretion to do so. (See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [applying this standard to new legislation granting discretion to dismiss a different enhancement].) Put differently, if ""the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required."" (*Ibid.*) Here, the trial court made it abundantly clear that it would not reduce the sentences of either Moreno or Landeros if it were ever granted greater discretion to do so. For instance, after the court stated that it had the discretion to strike the firearm enhancements, it declared that "positively not would I ever strike [them]" nor would the court "even think about striking [them]." Anticipating any further discretion that may be conferred in the future, the court went on to state: "I want to make it perfectly clear I would never, ever, ever think of striking the special circumstances as to Mr. Moreno and Mr. Landeros. [¶] I would never think of striking the gun allegations to Mr. Moreno and Mr. Landeros. [¶] I would never think of striking the strikes that have been applied to Mr. Moreno, Mr. Landeros. And that is based on the totality of this evidence, how evil these two are, and how morally corrupt they are." Moreno responds that the trial court, on remand, might have a change of heart and provide him "with a motive for attempted reform." We disagree; the court's intentions are crystal clear.

34

**D.** *Failure to impose sentence on conspiracy counts*

The trial court in this case imposed LWOP sentences on the first degree murder count for each defendant, and then stayed the remaining two conspiracy counts under Penal Code section 654. However, the trial court never imposed any sentence as to those conspiracy counts. This was error. Penal Code section 654 allows for the *execution* of a sentence to be stayed, not the *imposition* of that sentence. (*Mani, supra,* 74 Cal.App.5th at p. 380; *People v. Salazar* (1987) 194 Cal.App.3d 634, 640; Couzens, Bigelow & Prickett, Sentencing Cal. Crimes (The Rutter Group 2021) § 13:10.) Because the trial court never imposed any sentence on the conspiracy counts, we must remand for the court to do so.

**E.** *Shinn's challenge to the imposition of fines and assessments*

At the time Shinn was sentenced in November 2021, the court imposed a $10,000 restitution fine (Pen. Code, § 1202.4, subd. (b)), a $40 per count court operations fee (Pen. Code, § 1465.8, subd. (a)(1)), and a $30 per count court facilities fee (Gov. Code, § 70373, subd. (a)(1)). The court also ordered Shinn to pay $11,295.50 in victim restitution to the California Victim Compensation Board, liability to be joint and several with the codefendants. Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Shinn argues that the trial court was required to find that he had an ability to pay all of the fines, fees, and assessments before they were imposed, and insufficient evidence supports any implicit ability-to-pay determination.

We reject Shinn's argument for three reasons.

35

First, he arguably forfeited this objection. When defendant objected, he merely said that it would take him a long time to pay the fines because, with his sole income being prison wages, he would only be earning "pennies an hour."[5] At no point did defendant say he had the *inability* to pay the fees.

Second, we have held that *Dueñas* was wrongly decided. (*People v. Hicks* (2019) 40 Cal.App.5th 320, 322, review granted Nov. 26, 2019, S258946.) The propriety of *Dueñas* is currently before our Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844).

Lastly, Shinn has not carried his burden of showing that he is unable to pay. *Dueñas*, by its terms, does not excuse the payment of victim restitution (*Dueñas, supra*, 30 Cal.App.5th at p. 1169), so Shinn's objection—at most—reaches the $10,210 in fines and assessments. Yet this amount is not beyond Shinn's ability to pay in light of his LWOP sentence. "[E]very able-bodied" prisoner must work while imprisoned. (Pen. Code, § 2700; see also Cal. Code Regs., tit. 15, § 3040, subd. (k) ["An inmate's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct"].) Prison wages range from $12 to $56 per month. (Cal. Code. Regs., tit. 15, § 3041.2, subd. (a)(1).) The California Department of Corrections and Rehabilitation is entitled to collect victim restitution and the restitution fine by deducting 50 percent of a prisoner's wages and trust account deposits, plus another 5

---

**5** Counsel stated: "I computed it out, and $10,000 is about a 25-year undertaking before that obligation is lifted." This equates to a little less than $33.34 per month, but we note defendant was sentenced to LWOP, not a 25-year term of imprisonment.

36

percent for the administrative costs of the deduction. (Pen. Code, § 2085.5, subds. (a)-(d); Cal. Code Regs., tit. 15, § 3097, subds. (c), (f).) Despite Shinn's protestation that he has "no marketable skills" because he has "spent most of his adult life in custody," he is still able to earn wages by undertaking one of the many jobs on the long list of paying positions in prison. (Cal. Dept. of Corrections and Rehabilitation, Operations Manual (Jan. 1, 2022) § 51120.7.) Even the lowest paying category of jobs includes positions whose duties should be compatible with Shinn's purported lack of skills, such as shoe shiner, kitchen helper, or server. (*Ibid.*) To be sure, it may take Shinn a significant amount of time to earn enough money to pay the fees, but given his LWOP sentence, the trial court could have reasonably concluded that he failed to carry his burden to "present evidence of his . . . inability to pay." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1062 [defendant sentenced to term of 82 years to life had ability to pay $10,600 in restitution fines, $160 in court operations assessments, and $120 in court facilities funding assessments].)

### F. *Imposition of parole revocation fine*

Defendants argue that the trial court improperly imposed (but stayed) parole revocation fines against them pursuant to section 1202.45 because their life sentences do not include the possibility of parole. The People concede this was error. We agree. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185; *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.)

### G. *Correction of Abstract of Judgment*

Landeros was convicted of three counts and the trial court was required to impose a $40 court operations assessment and a

37

$30 criminal conviction assessment as to each count. (Pen. Code, § 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1).) The trial court erred here because it only imposed each of those assessments once, not three times. We may correct a trial court's failure to impose a mandatory fee on appeal. (*People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1530.) Accordingly, we order the clerk of the superior court to prepare an amended abstract of judgment to reflect the appropriate fines and assessments. (*People v. Chan* (2005) 128 Cal.App.4th 408, 425-426.)

## DISPOSITION

The convictions for the underlying offenses are affirmed. The gang enhancements for all three defendants, the firearm enhancements for Shinn and Moreno, and the gang-related special circumstances for all three defendants are vacated; the People may elect whether to retry them. The sentences are to be vacated: The multipliers on Shinn's and Moreno's first degree murder LWOP sentences are to be eliminated; the trial court is to impose sentences on the conspiracy counts; if the People elect not to retry the gang-related firearm enhancements (for Shinn and Moreno) and the gang-related special circumstances (for all defendants), they are to be stricken; and the court is not to impose any parole revocation fine. The matter is remanded for these purposes.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ